IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**OMEGA PATENTS, LLC,**
a Georgia limited liability company,

  Plaintiff,

vs.  Case No.       6:13-cv-1950-Orl-31DAB

**CALAMP CORP.,**
a Delaware corporation,

  Defendant.
_____/

**PLAINTIFF'S MOTION AND MEMORANDUM OF LAW TO EXCLUDE
THE TESTIMONY OF DEFENDANT'S EXPERT ON DAMAGES**

Omega Patents, LLC ("Omega") hereby moves this Court to exclude the proposed expert testimony of DeForest McDuff, Ph.D., and in support thereof, states as follows:

I.  BACKGROUND

Calamp has disclosed the report of McDuff, addressing damages in this patent infringement action. In an effort to minimize the damages claim, McDuff offers "opinions" that are improper and inadmissible. McDuff first improperly limits the universe of damages to Calamp's incremental profits. From this limitation, McDuff uses a subjective "word count" method in a wholly unscientific attempt to gauge the significance of the patents-in-suit. McDuff then applies a generic bargaining methodology and relies on generic industry data to further limit the potential damages. Because these methods are unreliable and use blanket assumptions and generic industry data rather than facts unique to this case, McDuff's "analysis" and opinions should be excluded.

1

II.  LEGAL STANDARD

In *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), the Supreme Court rejected the previous rule of law requiring "general acceptance" of a theory to be admissible. Instead, the Court looked to Rule 702, F.R.E., to address the admissibility of expert testimony. The *Daubert* Court held that the court is to act as a "gatekeeper" and determine whether expert testimony should be presented, consistent with Rule 702. *Daubert* addressed the admissibility of scientific testimony and identified a nonexclusive list of criteria a court might use in assessing proffered expert testimony. *Id.* at 594-595. In 1999, the Supreme Court again spoke on the issue of expert testimony in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). The *Kumho Tire* Court expanded *Daubert* to provide that the trial judge's general "gate-keeping" obligation applies not only to testimony based upon "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge. The Court held that a trial court may consider one or more specific factors identified in *Daubert* to determine that testimony's reliability. *Id.* at 140. The Court warned that "[w]here such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, … the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" *Id.* at 149.

The Federal Rules of Evidence 702 now provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

>   (d) the expert has reliably applied the principles and methods to the facts of the case.
>
>   Rule 702, F.R.E.

As part of its gate-keeping role under Rule 702, a court is tasked with reviewing the proffered expert opinion testimony prior to submitting it to the trier of fact. The requirements for the admission of expert testimony in light of *Daubert* are well known: Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical or specialized expertise, to understand the evidence or to determine a fact in issue. *See City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 562 (11th Cir.1998) (footnote omitted). There are thus three discrete inquiries: qualifications, relevance, and reliability. *See Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir.2003) (although there is "some overlap" among these inquiries, they "are distinct concepts that courts and litigants must take care not to conflate."). The burden of establishing these three requisites lies with the proponent of the evidence. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir.2004) (en banc).To the requirement of Rule 401 that evidence possess a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable," Rule 702 adds that expert evidence must "assist the trier of fact to understand the evidence or to determine a fact in issue." *United States v. Frazier*, 387 F.3d at 1260. The evidence must "concerns matters that are beyond the understanding of the average lay person.... Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262-63.

3

A witness who is unable to offer a basis for conclusions does not assist the trier of fact and should be excluded. *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002); *see also Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999) ("A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*."). A "perfectly equivocal opinion does not make any fact more or less probable and is irrelevant under the Federal Rules of Evidence." *Id*. Even a threshold showing under *Daubert* does not mean a court must accept the testimony; a court may exercise its discretion to exclude expert testimony that would not assist the trier of fact. *United States v. Hicks*, 103 F.3d 837, 847 (9th Cir. 1996). A fundamental requirement for expert testimony is whether the expert testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Rule 702, F.R.E. If an expert is unable to offer reasoning why one conclusion is more likely than another, it does not assist the trier of fact and should be excluded. *See*, *Pipitone*, 288 F.3d at 245.

In addition, expert testimony "must be 'scientific,' meaning grounded in the methods and procedures of science, and must constitute 'knowledge,' meaning something more than subjective belief or unsupported assumptions." *Nelson v. Tennessee Gas Pipeline Co.,* 243 F.3d 244, 251 (6th Cir. Tenn. 2001), quoting *Daubert*, 509 U.S. at 590. Rule 702 identifies three components of the reliability element: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. *Daubert* also identifies several non-exclusive factors that a court may consider as appropriate in gauging the reliability of the principles and methods utilized by the expert: (1) whether the methodology has

4

been, or is amenable to, testing; (2) whether it has been subjected to peer review and/or publication; (3) the known and potential error rate of the methodology; and (4) whether it has been generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-94. "Notably... these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.,* 326 F.3d 1333, 1341 (11th Cir. Fla. 2003). Among such factors, "[i]n evaluating the reliability of an expert's method ... a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink v. Cheminova, Inc*., 400 F.3d 1286, 1293, n. 7 (11th Cir. 2005); *see also Lozar v. Birds Eye Foods, Inc.*, 529 Fed. App'x 527, 530 (6th Cir. 2013)("To be reliable, the opinion must not have "too great an analytical gap" between the expert's conclusion, on the one hand, and the data that allegedly supports it, on the other.") citing *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 675–76 (6th Cir. 2010).

Similarly, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Cook v. Sheriff of Monroe County*, 402 F.3d 1092, 1111 (11th Cir.2005)(internal quotes omitted). An expert's unexplained assurance that her opinions rest on accepted principles fares no better. *McClain v. Metabolife Int'l, Inc*., 401 F.3d 1233, 1222 (11th Cir.2005). Moreover, "[t]he *Daubert* requirement that the expert testify to scientific knowledge -- conclusions supported by good grounds for each step in the analysis -- means that any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *McClain v. Metabolife*, 401 F.3d at 1245 (internal quotes omitted); *see also Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1344 (11th Cir.2003) ("[A]n expert's failure to explain the

basis for an important inference mandates exclusion of his or her opinion."). "Thus, a trial court may exclude expert testimony that is "imprecise and unspecific," or whose factual basis is not adequately explained." *Cook v. Sheriff of Monroe County*, 402 F.3d 1092, 1111 (11th Cir. 2005) citing *Frazier*, 387 F.3d at 1266.

### III.  MCDUFF'S ANALYSIS IS BASED ON AN IMPROPER CAP TO DAMAGES

Where a patentee is not entitled to lost profits, a reasonable royalty is determined as a measure of patent infringement damages. *See Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995). There are two baselines from which a reasonable royalty may be calculated: "an established royalty, if there is one, or if not, upon the supposed result of hypothetical negotiations between the plaintiff and defendant." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1357 (Fed. Cir. 2012) (*quoting Rite-Hite*, 56 F.3d at 1554). "This court has sanctioned the use of the Georgia-Pacific factors[1] to frame the reasonable royalty inquiry. Those factors properly tie the reasonable royalty calculation to the facts of the hypothetical negotiation at issue." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 60, n. 2 (Fed. Cir. 2012), citing *Uniloc*, 632 F.3d at 1317.

McDuff begins his "analysis" by calculating the incremental profits for the sales of the infringing devices, excluding certain expenses. (Ex. A, p. 34.) According to McDuff, the "incremental profits provide a measure of economic value to CalAmp that would be relevant for the hypothetical negotiation for the patent-in-suit." (Ex. A, p. 34.) McDuff looks back at the historical profits of Calamp from the infringing products (which were unknown at the time of the hypothetical negotiation in 2011), then uses Calamp's incremental profits as a cap on his damages opinions. In other words, McDuff's methodology caps any royalty rate to a number no larger than Calamp's historical incremental profits, with the benefit of hindsight into the profits

---

[1] *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

Calamp has enjoyed through infringement. (Ex. A, p. 34; Depo. 71:1-10.) McDuff's use of Calamp's profits is improper, as the Federal Circuit has recognized time and again -- the infringer's profits cannot be used to cap the reasonable royalty. *See Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1346 (Fed. Cir. 2013); *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1238 (Fed. Cir. 2011); *Golight, Inc. v. Wal-Mart Stores, Inc..*, 355 F.3d 1327, 1338 (Fed. Cir. 2004). This error forms the foundation of McDuff's entire opinion, as all of his damages opinions begin with the premise that Calamp's profit margin is the ceiling for damages. *See, e.g.*, Ex. A, p. 34, Attachments F-1, F-2, F-5-F-12. This error alone necessitates the exclusion of McDuff's opinions.

IV. <u>MCDUFF'S ANALYSIS IMPROPERLY APPORTIONS BASED ON MARKETING BROCHURES</u>

McDuff next relies on what he refers to as a "relative marketing emphasis" theory. McDuff's relative marketing emphasis "theory" is nothing more than a "word count," where McDuff selected a single marketing brochure from Calamp, counted the total words in certain sections, and then selected from thin air words he though might relate to the asserted patents. He then counted his chosen words and calculated the proportion of choice words with all words. The brochure McDuff used are at Exhibits 6 and $7^2$. The portions of these brochures used by McDuff have the same text other than the model numbers LMU-3000 (Ex. 6) and LMU-3030 (Ex.7)$^3$. McDuff subjectively selected portions of the brochures for his word count theory (identified in Attachments F-3 and F-4 of his report). (Ex. A, F-3 and F-4.) For reasons known only to McDuff, he decided to ignore the entire back side of the brochures, which provide the technical specifications and "Key Features" of the accused Calamp products, which would have changed

---

[2] All numbered exhibits have been lodged in the publicly-filed Appendix. The parties have sought leave to file all lettered exhibits under seal and await the Court's Order on this issue.

[3] There are some portions of the brochures, including the back side of each, that differ, but the portions used by McDuff appear to be identical.

7

his analysis significantly. (*Id.*) Perhaps more surprisingly, McDuff chose to ignore the bolded bullets on the front of the brochure, though he conceded during deposition that these purpose of these bullets can be to highlight the <u>most important features</u> of the product. (Ex. B, 75:20-24.) It is clear McDuff selected the sections of the marketing brochure to use in order to reach a smaller number – his explanation is wholly lacking in candor: "[the section would] help identify conceptually the components of contribution of the accused products." (Ex. B, 74:12-75:3.) McDuff "calculates" percentages using a combination of the actual word count of the entire selection (280 words) with his subjective quantification of 33% or 17.5%, concluding with specific percentages likely designed to give his word count theory the appearance of mathetical precision. (*See, e.g.*, Ex. A, F-3 and F-4.)

McDuff is not an engineer (Ex. B, 18:5-6) and certainly is not one of skill in the art in the technology. McDuff never bothered to speak to Calamp's technical expert to confirm that the words he selected included (or failed to include) subject matter covered by the claims of the patents. (Ex. B, 18:7-11.) McDuff failed to speak to anyone at Calamp to determine whether the marketing materials he used were representative of the most important aspects of the accused products, or to request additional marketing materials to test his word count theory on more than a single brochure. (Ex. B, 99:10-15, 102:12-16.) Moreover, McDuff was unaware that Calamp purposefully withheld information from its marketing materials to make Omega's infringement investigation more difficult and costly– information that would have rendered the novel word count theory wholly unreliable. (Ex. B, 101:19-24; Ex. E, 112:12-113:15.)

To pass the *Daubert* standards, Calamp must prove the methodology has been tested and error known. McDuff's methodology fails to satisfy each of these requirements. *Daubert*, 509 U.S. at 593-94. McDuff admitted that there is no way to calculate a standard error rate for his

8

word count methodology. (Ex. B, 91:3-6.) McDuff <u>never</u> even bothered to run his "analysis" on other Calamp marketing materials to see if his analysis was consistent across more than one part of a single brochure. (Ex. B, 100:7-11.) Similarly, McDuff never bothered to review the marketing materials of any of Omega's licensees to determine whether these materials reflected a similar emphasis to this of McDuff's analysis. (Ex. B, 140:21-141:5.)

The subjectivity and unreliability shines through when one focuses on the actual language relied on (and excluded) by McDuff. The total number of words used for McDuff's word count theory is 280 words, including the following 27 words from the second sentence: "The LMU-3000 is an ideal solution for automotive insurance, driver behavior management, auto rental and automotive applications when *access to the vehicle diagnostics interface (OBDII) is required*." (Ex. A, F-3, p.1.) Four of the five patents have claims directed to communicating with vehicle devices via the OBDII databus, including specific claims drawn to inventions that "reading the data related to vehicle speed from the vehicle data communications bus." (*See, e.g.*, '727 Patent.) McDuff determined that, in his economist's opinion, this sentence did not relate to the patented technology, notwithstanding the fact it clearly does relate to the patents-in-suit. Curiously, two sentences later, McDuff attributes the phrase "These features enable the LMU-3000 to *access vehicle diagnostic interface data,* track vehicle speed and location, plus detect hard braking, cornering or acceleration" to the patented technology. (Ex. A, F-3, p. 1.) How can access to the OBDII vehicle diagnostic interface be unrelated, when access to the OBDII vehicle data (via the diagnostic interface) is related in McDuff's unqualified and subject opinion? Further evidencing the subjective and unreliable nature of McDuff's "analysis," the same sentence references tracking "vehicle speed and location," which is the focus of the claims of the '727 and '989 patents, yet is not counted by McDuff. (*Id.*)

9

McDuff's methodology gives the same weight to words like "the" or "and" as to "tracking unit" or "interface data." Similarly, grammar and stylistic considerations that change the number of words used – considerations completely unrelated to how important a product feature may or may not be – alter the outcome of McDuff's "analysis" by changing the number of words in the sentences. For all McDuff knows, some of the advertised features may be completely irrelevant to Calamp customers. McDuff has no way of knowing whether a single customer ever saw or reviewed, much less relied on, the marketing brochure. There is simply nothing to tie the subjectively-selected portions of a single piece of marketing collateral to Omega's patents.

Not surprisingly, McDuff has never been permitted to present his word count theory to a jury (Ex. B, 87:20-23) and there are not any reported decision accepting such an unreliable (and un-testable) theory. Nonetheless, McDuff uses the percentages he "calculated" using his "relative marketing emphasis" theory, and applies that percentage to the incremental profits McDuff calculates for Calamp on a year over year basis. This word count review of a portion of a single marketing brochure yielded the conclusion that Omega's patents contribute only 7.4% of the functionality in the accused products. (Ex. A, F-5, F-6.)

McDuff's approach is improper; McDuff identifies nothing that ties the language used by Calamp's marketing department to the inventions of the patents-in-suit. "[E]xpert testimony opining on a reasonable royalty rate must 'carefully tie proof of damages to the claimed invention's footprint in the market place.'" *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1317 (Fed. Cir. 2011), quoting *ResQNet.com, Inc. v. Lansa, Inc,*, 594 F.3d 860, 869 (Fed. Cir. 2010). In *Stragent, LLC v. Intel Corp.*, 2014 U.S. Dist. LEXIS 106167, *12 (E.D. Tex. Mar. 6, 2014), a case presided over by Judge Timothy Dyk of the Federal Circuit (sitting by

10

designation), the plaintiff's damages expert sought to rely on an analysis of the "accused feature's contribution to the overall prices realized by [defendant]." The analysis performed by plaintiff's expert reviewed product specifications from defendant's website and a list of 19 product features, weighing each feature evenly and determining that the patented technology contributed to one of the 19 features. *See id*. Judge Dyk excluded the opinions, finding the "attribution of equal value to all 19 RAS features is not based on any theory that meets the *Daubert* criteria of verifiability, peer review or publication, an acceptable error rate, or general acceptance in the scientific community." *Id*., 2014 U.S. Dist. LEXIS 106167, *15. Analogously, McDuff's word count theory attributes equal weight to each of the words he (subjectively) selected for his "analysis." As was the case with plaintiff's expert in *Stragent* (*id*. at *16), McDuff has no technical qualifications; without the requisite technical experience (or even reliance on a qualified technical expert), McDuff cannot link marketing lingo with the actual claims of the patents-in-suit. Like in *Stragent*, there is no way to verify or review McDuff's "analysis," nor to calculate an error rate.

McDuff cannot identify a single fact in this case that suggests that the counting words from a Calamp marketing brochure has any relation to the value of the patents-in-suit. *LaserDynamics,* 694 F.3d at 67 ("A damages theory must be based on 'sound economic and factual predicates.'") Instead, the jury would be left with nothing more than "the *ipse dixit*" of McDuff, making his unsupported proclamation based on nothing more than academic theories with no conceivable connection to this case. Such conclusions are improper. *See Cook v. Sheriff of Monroe County*, 402 F.3d at 1111; *McClain*, 401 F.3d at 1222. Guesswork does not pass the *Daubert* standard (*see Stragent,* 2014 U.S. Dist. LEXIS 106167, *16-17); McDuff's word count theory should be excluded.

V. <u>MCDUFF'S IMPROPER USE OF AN UNRELATED "BARGAINING THEORY"</u>

According to McDuff, his word count theory was supposed to apportion the functionality of the accused products between the claims of the invention versus unclaimed technology. (Ex. B, 68:1-8.) McDuff then undertakes a <u>second</u> round of apportionment, allegedly to determine how much of the benefit from Omega's patented inventions was contributed by Omega, and as a corollary, how much benefit Calamp gets for incorporating functionality that infringes Omega's patents in Calamp's products.[4] (*Id.*) Essentially, McDuff's methodology splits the value of Omega's patents between the parties such that Calamp receives the portion of profits allegedly attributable to Calamp's contribution, as well as part of the value of the patents themselves, under compensating Omega. There is no known authority for applying both reduction exercises in combination. The basic theory employed by McDuff for the second round of apportionment is a generic bargaining methodology, which McDuff refers to as the "Muthoo" theory, aided by generic industry data. This methodology is fatally flawed and cannot withstand scrutiny under recent Federal Circuit case law.

    a)    <u>The Federal Circuit Precludes the use of Generic Models, Assumptions and Data</u>

Courts have recognized that using generic industry data is improper because such data "is not tethered to the relevant facts and circumstances of the present case." *Multimedia Patent Trust v. Apple Inc.*, 2012 U.S. Dist. LEXIS 165928, *34 (S.D. Cal. Nov. 20, 2012) (excluding expert opinions based on generic industry data); *see also Chico's Fas, Inc. v. Clair,* 2015 U.S. Dist. LEXIS 71716, *10 (M.D. Fla. June 3, 2015); *Atlas IP, LLC v. Medtronic, Inc.*, 2014 U.S. Dist. LEXIS 158787 (S.D. Fla. Oct. 6, 2014)(excluding opinions on a reasonable royalty based on the "RoyaltyStat database"); *IP Innovation L.L.C. v. Red Hat, Inc.*, 705 F. Supp. 2d 687, 691 (E.D.

---

[4] McDuff assumes for the purpose of his analysis that the products infringe (Depo., 21:10-14), so his apportionment provides Calamp with uncompensated benefits for infringing functionality .

12

Tex. 2010)(excluding the reasonable royalty opinions based on the Licensing Economics Review "LER" publication). In *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1317 (Fed. Cir. 2011), the Federal Circuit considered the reliability of the so-called "25 percent rule of thumb" as it has been applied to the *Georgia-Pacific* analysis of patent damages. "The 25 percent rule of thumb is a tool that has been used to approximate the reasonable royalty rate that the manufacturer of a patented product would be willing to offer to pay to the patentee during a hypothetical negotiation." *See id*. at 1312. The 25 percent rule of thumb was a blanket assumption that a manufacturer would be willing to pay 25% of its profits to incorporate the patented invention in dispute. *See id*. Despite years of usage in patent litigation, the Federal Circuit held that the "25 percent royalty had no relation to the facts of the case, and as such, was arbitrary, unreliable, and irrelevant. The use of such a rule fails to pass muster under *Daubert* and taints the jury's damages calculation." *See id* at 1318.

Similarly, the Federal Circuit rejected damages theories using the Nash Bargaining Solution, yet another economic theory that relies on baseline numerical assumptions rather than facts specific to a particular case. *See VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1333 (Fed. Cir. 2014). In *VirnetX*, the plaintiff's damages expert started with the "Nash Bargaining Solution," which attributed a 50/50 split of the incremental profits between the licensor and licensee in hypothetical negotiations based on certain generic assumptions, then "modified" the solution to reduce the portion of the infringer's incremental profits to 45% to account for a "weaker bargaining position." *Id*. at 1325. The *VirnetX* Court analogized the Nash Bargaining Solution to the 25 percent rule of thumb, finding the same fundamental flaws preclude its use. *Id*. at 1333; *see also Robocast, Inc. v. Microsoft Corp.,* 2014 U.S. Dist. LEXIS 10745 (D. Del. Jan. 29, 2014)(excluding expert testimony based on Nash Bargaining Solution); *Dynetix Design*

*Solutions, Inc. v. Synopsys, Inc.,* 2013 U.S. Dist. LEXIS 120403, *15 (N.D. Cal. Aug. 22, 2013)(excluding expert testimony on royalty rate beginning from a 50/50 split as "indistinguishable from 25% rule").

      b)    <u>McDuff's Muthoo Theory is Nothing More than the Nash Bargaining Solution with the Addition of Generic Industry Data</u>

To offer his opinions on the second level of apportionment, McDuff cites to an economic bargaining theory articulated by Abhinay Muthoo (the "Muthoo" theory), which McDuff contends provides an "economic framework" for the hypothetical negotiation. (Ex. A, p. 40.) The Muthoo model is not specific to patent negotiations, but instead is a "general economic negotiation framework." (Depo. 114:15-18.) The Muthoo model itself starts with the "Rubinstein" Model (Depo., 137:1-8), yet another generic bargaining model not specific to patents, and certainly not specific to the facts of this case. Muthoo provides one mathematical equation that, according to McDuff, is relevant to his opinion on damage, which is referred to by Muthoo as Corollary 3.1: $\eta_A = \frac{r_B}{r_A + r_B}$ . (Ex. A, p. 42; Ex. 10, p. 46 (Corollary 3.1).) As explained by Muthoo, Corollary 3.1 "is identical to the asymmetric <u>Nash Bargaining Solution</u> of the bargaining problem…" (Ex. 74, p. 52, emphasis added.) McDuff conceded that the formula used in his opinion, Corollary 3.1 from Muthoo, is related to the Nash Bargaining Solution, and if the parties have an equal discount rate, the Nash Bargaining Solution "provides a 50 percent split." (Ex. B, 136:4-18.) The Muthoo theory is nothing more than another flawed economic theory under a different name and with meaningless formulas. It is the Nash Bargaining Solution – a theory based on generalizations and already expressly rejected by the Federal Circuit.

In his written report, McDuff recites six "assumptions" for the Muthoo model, but none of them are fact specific or unique to the hypothetical negotiation between Omega and Calamp.

(Ex. B, 114:19-24.) The first assumption is the generic expectation of value in the apportioned technology, which is certain if one presumes, as they must for evaluating a reasonable royalty in a patent dispute, that there exists a willing licensor and licensee[5]. (Ex. B, 115:12-116:1.) Similarly, McDuff admitted during deposition that the remaining five assumptions are generic to any hypothetical negotiation and not unique to the dispute between Omega and Calamp. (Ex. B, 116:2-117:2, 118:22-119:11.) There are no factual connections between these generic Muthoo assumptions and the facts of this case.

In *Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1119-21 (N.D. Cal. 2011), the court excluded testimony based on Nash Bargaining Solution. The court noted that the Nash Bargaining Solution "relies on 'a few general assumptions' that 'idealize the bargaining problem.'" *Id.* at 1119. Similarly, in this case McDuff articulates a number of non-specific assumptions unchanged by the actual parties in this case. These assumptions generally apply to many (or all) parties in a hypothetic negotiation. Simply reciting standard assumptions does not 'carefully tie proof of damages to the claimed invention's footprint in the market place.'" *Uniloc,* 632 F.3d at 1317. McDuff attempts to provide the appearance of a fact-specific analysis with the conclusory statement that Calamp should have lower opportunity costs (Ex. A, p. 41), but this conclusion is without knowledge specific to Omega, instead using industry data from companies other than Omega. (Ex. B, 141:20-143:13.) In *Oracle*, the court excluded testimony based on the Nash Bargaining Solution, finding it "would invite a miscarriage of justice by clothing a fifty-percent assumption in an <u>impenetrable façade of mathematics</u>." 798 F. Supp. 2d at 1120 (underlining added). Likewise, in this case McDuff cites meaningless, albeit complicated, mathematical formula and cites numerous references on the general application of bargaining

---

[5] "I understand that a reasonable royalty can be determined through an analysis of what a *willing licensor and a willing licensee* would have bargained for during an arm's-length, hypothetical negotiation occurring on the eve of infringement." (Ex. A, p. 3, emphasis added.)

models, none of which focus on facts similar to this case.

After reciting the generic Muthoo/Nash assumptions, McDuff uses the "weighted average costs of capital (WACC)." (Ex. A, p. 42.) McDuff then uses the WACC in combination with the Muthoo/Nash formula to arrive at his conclusion on the second round of apportionment. (Ex. A, p. 43.) McDuff explained that to calculate the WACC, one needs to know at least the amount of capital and debt held by a company, as well as the cost of raising that capital and debt, and other references[6] note that the corporate tax rate is also required. (Ex. B, 119:21-120:6.) Of course, McDuff did not know <u>any</u> of this data for Omega, never bothered to request the data, and could not possibly calculate the WACC for Omega to tie his analysis to this case. (Ex. B, 141:20-143:13.) Rather than using data related to this case, McDuff used the Ibbotson Cost of Capitol Yearbook, a reference guide that provides generic data and market returns for business valuation, not patent valuation. (Ex. A, 42-43.) The data in the Ibbotson reference include composite industry data for patent owners, for which Ibbotson's does not identify the companies included within the composite index. (Ex. B, 122:6-20, 123:4-9.) No one in this case knows the specific companies used by McDuff as a proxy for calculating Omega's WACC, nor whether they share any economic similarity to Omega. Perhaps the use of Ibbotson is novel to patent cases, but the Ibbotson data are no better than using other types of generic industry data rejected because such data "is not tethered to the relevant facts and circumstances of the present case." *Multimedia Patent Trust*, 2012 U.S. Dist. LEXIS 165928, *34.

McDuff did not even bother to calculate the WACC for his own client. Instead, to obtain the WACC for Calamp, McDuff relies on a Bloomberg publication. (Ex. B, 121:4-8.) McDuff did not investigate how Bloomberg calculated the number. (Ex. B, 134:20-25.) With the WACC

---

[6] *See, e.g.,* http://www.investopedia.com/ask/answers/030915/what-formula-calculating-weighted-average-cost-capital-wacc-excel.asp.

(calculated by someone else) for Calamp and the WACC using unknown companies (and generic industry data) as a proxy for Omega, McDuff concludes that Calamp's opportunity costs of capital dictate that Calamp is entitled to 54.5% of the significantly reduced portion of profits from infringement. (Ex. A, p. 43.)

"[A]ny step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *McClain*, 401 F.3d at 1245. Here every step further undermines the unverifiable methodologies of McDuff. McDuff's methodology relies on several layers of assumptions and nonspecific industry data, including the blanket assumptions of the Muthoo theory, the generic equations of Muthoo/Nash Bargaining Solution, and Ibbotson generic industry data. McDuff's attempted novel use of WACC data on the borrowing ability of the parties relies on generic industry data, the support for which is unknown to McDuff, with no logical tie to the value of the patents-in-suit. The Muthoo theory is nothing more than the Nash Bargaining Solution or the 25% rule of thumb with a new label but equally improper. *See VirnetX, Inc. v. Cisco Sys.*, 767 F.3d at 1333; *Uniloc,* 632 F.3d at 1318. McDuff's Muthoo and WACC theories are improper. *See id.* Compounding the improper methodology is the use of flawed data (of unknown origins) as a proxy for Omega to artificially reduce the potential damages for his client. McDuff's methodologies are inadmissible and should be excluded. *See Uniloc,* 632 F.3d at 1318.

VI. <u>CONCLUSION</u>:

McDuff relies on complicated-sounding economic theories and "calculations" of words to provide the appearance of legitimacy. However, the very purpose of this Court's gate keeper role is to ensure the jury will not be presented with unreliable opinions cloaked in a dense economics presentation clearly designed to go over the juror's head. McDuff improperly limits his opinion

to the incremental profits of Calamp, a tactic rejected by the Federal Circuit. Using those capped figures, McDuff then applies an untested and unreliable word count theory, attempting to link the language from a section of a single item of Calamp marketing collateral to the benefits of the patents-in-suit. McDuff next turns to overcomplicated economics theories built on generic assumptions and cloaked data devoid of any link to this case to arrive at an opinion that pleases his client but runs afoul of the Federal Circuit's mandate that damages theories be tied to the facts of the case. This Court should exclude McDuff's opinions in their entirety.

## **LOCAL RULE 3.01(g) CERTIFICATION**

Pursuant to Local Rule 3.01(g), counsel for the Omega has conferred with counsel for Calamp, who stated that Calamp is opposed to the relief sought in this Motion.

Respectfully submitted July 1, 2015.

*/s/Ryan T. Santurri*
Brian R. Gilchrist, Florida Bar No. 774065
bgilchrist@addmg.com
Ryan T. Santurri, FL Bar No. 015698
rsanturri@addmg.com
ALLEN, DYER, DOPPELT,
MILBRATH & GILCHRIST, P.A.
255 South Orange Avenue, #1401
Orlando, FL 32801
Telephone: (407) 841-2330
Facsimile: (407) 841-2343

*Counsel for Omega Patents, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2015, I electronically-filed the foregoing using the Case Management/Electronic Case Filing ("CM/ECF") System, which will send a Notice of Electronic Filing to the following CM/ECF participants:

Christopher S. Carver, Esq.
Florida Bar No. 993580
AKERMAN LLP
One Southeast Third Avenue, 25th Floor
Miami, FL 33131-1714
Tel.: 305-374-5600
Fax: 305-374-5095
E-mail: christopher.carver@akerman.com

Joel A. Kauth, Esq.
Eugene Chong, Esq.
KPPB LLP
2400 East Katella Avenue, Suite 1050
Anaheim, CA 92806
Tel.: (949) 852-0000
Fax: (949) 852-0004
E-mail: Joel.Kauth@kppb.com
         Eugene.Chong@kppb.com

Peter A. Chiabotti, Esq.
Florida Bar No. 0602671
AKERMAN LLP
222 Lakeview Avenue, 4th Floor
West Palm Beach, FL 33401
Tel.: (561) 653-5000
Fax: (561) 653-5333
E-mail: peter.chiabotti@akerman.com

Carrie Ann Wozniak, Esq.
Florida Bar No. 0012666
AKERMAN LLP
420 S. Orange Avenue, Suite 1200
Orlando, FL 32801
Tel: (407) 423-4000
Fax: (407) 843-6610
Email: carrieann.wozniak@akerman.com

*/s/Ryan T. Santurri*
Ryan T. Santurri