# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

OMEGA PATENTS, LLC,

                  Plaintiff,

    v.

CALAMP CORP.,


                  Defendant.

No. 6:13-CV-1950-PGB-DCI

**CALAMP CORP.'S COMBINED MOTION FOR JUDGMENT AS A MATTER OF LAW, FOR A NEW TRIAL, AND FOR A REMITTITUR OF DAMAGES**

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

LEGAL STANDARDS ..........................................................................................................2

ARGUMENT ..........................................................................................................................3

I.     The Court Should Grant CalAmp's Renewed Motion for JMOL That the
Accused LMUs Do Not Infringe the '885 Patent .................................................... 3

II.    The Court Should Grant CalAmp's Renewed Motion for JMOL That the
Accused LMUs Do Not Infringe the '278 Patent, or at a Minimum Order a
New Trial .................................................................................................................... 7

      A.    Omega's Improper Claim Construction Arguments Tainted the
Jury's Consideration of the "Corresponding Vehicle Device Code"
Limitation.................................................................................................... 7

      B.    Omega Failed to Identify a "Corresponding Vehicle Device Code"
in the Accused LMUs ................................................................................. 8

      C.    Omega's Expert Was Improperly Permitted to Testify Beyond the
Scope of His Expert Report With Respect to the "Enabling Data"
Limitation.................................................................................................... 9

III.    If the '278 Patent Is Infringed by the Accused LMUs, the Damages Should
be Remitted or, Alternatively, CalAmp Should Be Granted a New Trial on
Damages.................................................................................................................... 14

      A.    The Damages Award Does Not Reflect the '278 Patent's
Incremental Value .................................................................................... 15

      B.    The License Agreements Relied Upon by Omega's Expert to Justify
the Damages Award Are Not Comparable ............................................... 18

      C.    The $1 Per Unit Rate in Certain of Omega's License Agreements Is
Most Comparable to the Hypothetical Negotiation ................................. 23

      D.    CalAmp's Damages Expert Was Erroneously Precluded From
Providing Unchallenged Rebuttal Opinions That Were Disclosed in
His Expert Report .....................................................................................24

CONCLUSION......................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Banks v. United States*,
    741 F.3d 1268 (Fed. Cir. 2014)................................................................................4

*Cent. Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Sols., P.C.*,
    482 F.3d 1347 (Fed. Cir. 2007)................................................................................6

*Cleveland v. Home Shopping Network, Inc.*,
    369 F.3d 1189 (11th Cir. 2004) ...............................................................................2

*Collado v. United Parcel Serv., Co.*,
    419 F.3d 1143 (11th Cir. 2005) ...............................................................................2

*Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys, Inc.*,
    809 F.3d 1295 (Fed. Cir. 2015)..............................................................................18

*Ericsson, Inc. v. D-Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014)....................................................................15, 16, 17, 18

*Fenner Inv., Ltd. v. Microsoft Corp.*,
    632 F. Supp. 2d 627 (E.D. Tex. 2009), *aff'd*, 369 F. App'x 132 (Fed. Cir.
    2010) ........................................................................................................................6

*Guevara v. NCL (Bahamas) Ltd.*,
    920 F.3d 710 (11th Cir. 2019) ..........................................................................10, 11

*Hanson v. Alpine Valley Ski Area, Inc.*,
    718 F.2d 1075 (Fed. Cir. 1983)..............................................................................20

*Litton Sys., Inc. v. Honeywell, Inc.*,
    140 F.3d 1449 (Fed. Cir. 1998), *abrogated on other grounds by Festo Corp. v.
    Shoketsu Kinzoku Kogyo Kabushiki Co.,* 234 F.3d 558 (Fed. Cir. 2000)..............2, 8

*Minks v. Polar Indus., Inc.*,
    546 F.3d 1364 (Fed. Cir. 2008)................................................................................2

*Omega Patents, LLC v. CalAmp Corp.*,
    920 F.3d 1337 (Fed. Cir. 2019)..................................................................... *passim*

*Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*,
    725 F.3d 1377 (Fed. Cir. 2013)..............................................................................10

*Richards v. Michelin Tire Corp.*,
    21 F.3d 1048 (11th Cir. 1994) .................................................................................2

*Signal Oil & Gas Co. v. Barge W-701*,
   654 F.2d 1164 (5th Cir. 1981) ...................................................................25

*Specialized Transp. of Tampa Bay, Inc. v. Nestle Waters N. Am., Inc.*,
   No. 8:06-cv-421, 2009 WL 1046135 (M.D. Fla. Apr. 19, 2009), *aff'd*, 356 F.
   App'x 221 (11th Cir. 2009); Dkt. 231 .......................................................2

*Starbuck v. R.J. Reynolds Tobacco Co.*,
   102 F. Supp. 3d 1281 (M.D. Fla. 2015) .....................................................2

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011)...........................................................16, 18

**Statutes**

Fed. R. Civ. P. 26..............................................................................10, 11, 12

Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii) ...............................................................10

Fed. R. Civ. P. 26(a)(2)(B)(i-vi) .................................................................12

Fed. R. Civ. P. 50(a) .....................................................................................1

Fed. R. Civ. P. 50(b) .....................................................................................2

# INTRODUCTION

Based on the evidence at trial, a reasonable jury could only conclude that CalAmp's accused LMU-3000, LMU-3030, and LMU-3050 products ("the Accused LMUs") do *not* directly infringe U.S. Patent Nos. 6,756,885 ("the '885 patent") and 8,032,278 ("the '278 patent").[1]  The jury's contrary findings of direct infringement for the '885 patent (by CalAmp's customers) and the '278 patent (by CalAmp) not only lacked evidentiary support, but also were infected by serious and prejudicial errors at trial.  Most notably, Omega's expert was permitted to testify beyond the opinions and information set forth in his expert report despite CalAmp's objections and an explicit *in limine* order prohibiting such testimony, and Omega also improperly invited the jury to disregard the Court's claim construction.  As explained further below, CalAmp is therefore entitled to judgment as a matter of law ("JMOL") that the Accused LMUs do not directly infringe the '885 and '278 patents or, in the alternative, a new trial.[2]

Beyond the erroneous infringement findings, the record does not support the damages award of $4,586,110 (based on a royalty of $5 per unit) for the '278 patent.  Dkt. 310.  The record at most would support a royalty of $1 per unit.  Accordingly, if the Court allows the liability finding on the '278 patent to stand, the damages award should be remitted to $1 per unit (a total of $917,223), or alternatively a new trial on damages for the '278 patent should be ordered.[3]

---

[1] The jury correctly determined that CalAmp's VPOD and VPOD2 products do not infringe the '885 or '278 patents. Dkt. 310.  CalAmp does not challenge those findings.

[2] The jury correctly found that CalAmp did not induce infringement of the '885 patent and awarded no damages on that patent. However, the jury incorrectly found that CalAmp's customers directly infringe the '885 patent when they use the Accused LMUs, a decision that should be set aside to remove the cloud of uncertainty for customers.

[3] Before the case was submitted to the jury, CalAmp timely moved for JMOL on these issues pursuant to Fed. R. Civ. P. 50(a).  *See* Day 4 Tr. at 32-60; Dkt. 301; Dkt. 303; Dkt. 304; Dkt. 306.

## LEGAL STANDARDS

Under Fed. R. Civ. P. 50(b), JMOL on an issue is appropriate where, as here, "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192 (11th Cir. 2004). When ruling on a motion for JMOL, courts "look at the record evidence, drawing all inferences in favor of the nonmoving party." *Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1149 (11th Cir. 2005).

Alternatively, a new trial should be ordered where, as here, the verdict is against the weight of the evidence, damages are excessive, or the trial was not fair to the moving party, including "substantial errors in admission or rejection of evidence." *Specialized Transp. of Tampa Bay, Inc. v. Nestle Waters N. Am., Inc.*, No. 8:06-cv-421, 2009 WL 1046135, *1 (M.D. Fla. Apr. 19, 2009) (citation omitted), *aff'd*, 356 F. App'x 221 (11th Cir. 2009); Dkt. 231 at 4. A new trial may be granted based on the weight of the evidence even where "there may be substantial evidence which would prevent the direction of a verdict." *Starbuck v. R.J. Reynolds Tobacco Co.*, 102 F. Supp. 3d 1281, 1304 (M.D. Fla. 2015) (citation omitted). A new trial should also be granted where "a jury may have relied on an impermissible basis in reaching its verdict." *Litton Sys., Inc. v. Honeywell, Inc.*, 140 F.3d 1449, 1465 (Fed. Cir. 1998), *abrogated on other grounds by Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* 234 F.3d 558 (Fed. Cir. 2000); *see also Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1055 (11th Cir. 1994). Where evidentiary errors affected a party's substantial rights, a new trial is required. *Specialized Transp.*, 2009 WL 1046135, at *9.

The Court also may "overturn the jury's [damages] verdict upon a determination that it is excessive," which "result[s] in the order of a new trial, either unqualified or conditioned on [the patent holder's] refusal to accept a reduction." *Minks v. Polar Indus., Inc.*, 546 F.3d 1364, 1373

2

(Fed. Cir. 2008) (applying 11th Circuit law).

## ARGUMENT

I.    **The Court Should Grant CalAmp's Renewed Motion for JMOL That the Accused
LMUs Do Not Infringe the '885 Patent.**

To prove direct infringement of the '885 patent, Omega was required to demonstrate that

the Accused LMUs contain

> a multi-vehicle compatible controller cooperating with said transmitter and said
> receiver and for storing a set of *device codes* for a given vehicle device for a
> plurality of different vehicles, for *reading a device code* from the data
> communications bus, and for *determining a match between a read device code
> and the stored device codes* to thereby provide compatibility with a plurality of
> different vehicles.

JE3 ('885 Patent), cl. 1 (emphases added).  Critically here, the Court construed "device code" as

a "signal *from* a vehicle device."  Dkt. 50 at 15-17 (emphasis added).

Omega and its expert, Mr. McAlexander, however, disregarded this construction at trial.

Mr. McAlexander acknowledged that "[a] stored device code is a type of device code."  Day 3

Tr. at 109:4-8.[4]  But when he applied the Court's construction of "device code" to the Accused

LMUs, Mr. McAlexander took the improper position that the "[s]tored device codes would be

codes that have been previously provided during the provisioning process, configuring process to

the LMU, store[d in] flash, and so these would be the device codes that are particularly

associated with particular vehicle devices and bus architecture."  Day 3 Tr. at 65:2-8.[5]  He did

not even attempt to argue, much less demonstrate, that any stored device codes originated from a

vehicle device, as the Court's construction requires.

---

[4] Per the Court's Order, all citations to the trial transcript are to the uncertified versions from each day.  Dkt. 325.

[5] As Mr. McAlexander explained, "[t]he stored device code is stored – is stored in the LMU.  It's actually originally stored in the flash," which is part of the LMU itself.  Day 3 Tr. at 66:24-25; *id.* at 23:17-24:5; *id.* at 71:1-3.

Mr. McAlexander confirmed on cross-examination that he was *not* relying on a "signal

from a vehicle device" in opining that the LMUs include the claimed stored device codes:

> Q. I think you said on direct that the stored device code is what you said was
> previously provided in the provisioning process.  Did I take that down correctly?
> *A. Yes, that's correct.*
> Q. And I think you said that it came from flash, correct?
> *A. Yes, that's correct.*
> Q. And the flash is part of the LMU, correct?
> *A. That is part of it, yes.*
> Q. And the LMU is not a vehicle device, correct?
> *A. That is correct, for the purposes of this claim, it is not.*

Day 3 Tr. at 109:15-110:1 (emphases added).  For his "stored device code," Mr. McAlexander

admittedly relied on a code originating from the LMU itself, which the Court's construction

precluded.  Dkt. 309 at 12 ("In the context of the asserted claims, the accused LMUs and VPODs

are not vehicle devices.").

This is the same flawed theory that resulted in the Federal Circuit setting aside the jury's

verdict on the '885 patent after the first trial.  *See Omega Patents, LLC v. CalAmp Corp.*, 920

F.3d 1337, 1347 (Fed. Cir. 2019) ("Omega's primary theory at trial was that the LMU was a

'vehicle device' and the signals it sent to the ECU were infringing 'device codes.'  This theory

was inconsistent with the proper claim construction to which Omega agreed, however.")

(citations omitted).  By again advancing a theory inconsistent with the construction of "device

codes," Omega not only contravened this Court's *Markman* order, but also violated the law-of-

the-case doctrine.  *See Banks v. United States*, 741 F.3d 1268, 1276 (Fed. Cir. 2014) ("The law-

of-the-case doctrine posits that when a court decides upon a rule of law, that decision should

continue to govern the same issues in subsequent stages in the same case.") (internal quotation

marks and citation omitted); *id.* at 1279 ("[A]ll issues within the scope of the appealed judgment

are deemed incorporated within the mandate and thus are precluded from further adjudication.")

(citation omitted).  The Federal Circuit applied this Court's construction of "device codes" in the first appeal, and also held that Omega's theory that signals from the LMU can be device codes was inconsistent with that construction.  Omega was barred from taking contrary positions on remand.

During closings, Omega's counsel reinforced its error by telling the jury that the Court's construction of "device codes" is inapplicable to stored device codes:

> Mr. Rein came up with a new theory that somehow device code and stored device code are the same.  When the judge instructs you on how to interpret claim terms, you will hear that the device code is defined.  *You will not hear that a stored device code is defined.  Stored device code is a separate and distinct element.*  Under Mr. Rein's new theory, somehow the ECU will send a device code and then match it with its own sent device code.  That's simply silly.  And they couldn't even find an expert that would come here and advance that theory to you.  *The only expert that came appeared to advance an infringement theory, interpret a stored device code as one of ordinary skill in the art would, that would be downloaded on to the LMU so you would have something to match what the ECU said to you.*

Day 6 Tr. at 82:19-83:7 (emphases added).  This was the same flawed argument it made in response to CalAmp's oral JMOL motion, which should have been granted.  Day 4 Tr. at 36:3-39:23 (arguing in opposition to CalAmp's pre-verdict JMOL motion that "the notion that somehow the stored device codes and the read device codes both must come from the same vehicle and from a vehicle device just doesn't make any sense in the context of this claim. . . . [S]tored device codes is not – that particular term is not a term that was one that was subject to a separate construction."); *id.* at 45:16:24 ("[T]he notion that a read device code and a stored device code is all the same as the Court's construction of a device code, I don't think that that is consistent with the claim and I think that we can see that this all breaks down 'cause what – I mean, what Mr. Rein is arguing is that the stored device code, that which it is using to match and determine the vehicle compatibility comes from the vehicle that it is in and that doesn't make

any sense in the context of these claims.").

      Omega's assertion that a "stored device code" is not a "device code" finds no support in
the Court's *Markman* Order, is contrary to the Federal Circuit's decision, and violates the
Court's prior directive that "an expert may not offer claim definitions to the jury that are at odds
with the Court's construction."  Dkt. 50 at 15-17 (the Court's *Markman* Order referring to
portions of the specification describing "when a device code is read" and "storing a set of device
codes" in construing the "device codes" limitation); Dkt. 117 at 4 ("The Court's construction of
the claims limits the scope of the opinions which an expert may present to the jury. . . . Thus,
expert opinions in patent litigation must be based on the court's claim construction in order to be
considered relevant and reliable and, therefore, admissible.").  Moreover, Omega waived any
argument that a "stored device code" is something different than a "device code":  Omega never
contended during the claim construction process or otherwise prior to trial that a "stored device
code" does not have to meet all the requirements of a "device code," and in fact it took exactly
the opposite position.[6]  It could not change directions in the middle of trial.  *See, e.g.*, *Cent.
Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Sols., P.C.*, 482 F.3d 1347, 1356 (Fed.
Cir. 2007) ("The district court found that ACS waived any argument with respect to this term by
failing to raise it during the claim construction phase.  We agree."); *Fenner Inv., Ltd. v.
Microsoft Corp.*, 632 F. Supp. 2d 627, 638 (E.D. Tex. 2009), *aff'd*, 369 F. App'x 132 (Fed. Cir.

---

[6] During claim construction, Omega contended, incorrectly, that a "device code" is a signal to or from a vehicle
device, and never suggested "device code" would have a different meaning if it was a "stored device code" rather
than a "read device code."  To the contrary, Omega expressly equated stored and read device codes, arguing that
"*[d]evice codes* are more properly understood to mean signals to or from a vehicle device, as this allows *device
codes to be read from the bus, as well as stored* and processed by the controller, as required by the claims and
described in the specification."  Dkt. 40 at 9 (emphases added).  When the Court construed "device codes" to mean a
"signal from a vehicle device," Omega never sought any further construction or suggested until the retrial was
underway that the Court's definition "just doesn't make any sense."  Day 4 Tr. at 36:20-23.

2010) ("Because this argument is contrary to the claim construction order and was not raised prior to or even following the claim construction hearing it is waived.").

Because Omega introduced no evidence of infringement under the Court's claim construction, JMOL that the Accused LMUs do not directly infringe the '885 patent should be granted.

## II.    The Court Should Grant CalAmp's Renewed Motion for JMOL That the Accused LMUs Do Not Infringe the '278 Patent, or at a Minimum Order a New Trial.

To establish infringement of the '278 patent, it was Omega's burden to demonstrate that the Accused LMUs utilize "at least one *corresponding vehicle device code* from among a plurality thereof for different vehicles" and that the LMUs contain "a downloading interface for permitting downloading of *enabling data related to the at least one corresponding vehicle device code*." JE5 ('278 patent), cl. 1 (emphases added). Omega failed to make this showing, entitling CalAmp to JMOL of non-infringement of this patent, or at least a new trial.

### A.    Omega's Improper Claim Construction Arguments Tainted the Jury's Consideration of the "Corresponding Vehicle Device Code" Limitation.

On appeal after the first trial, the Federal Circuit identified the "device code" limitation as critical to the infringement analysis for the '278 patent and held that because the asserted claims of the '278 patent "have a 'device code' limitation," and because Omega's device code "theory was inconsistent with the proper claim construction" of that term, a new trial was required on both the '278 and the '885 patents. *Omega Patents*, 920 F.3d at 1347, 1349. The Federal Circuit explained that because Omega's infringement theory had introduced potential confusion regarding whether a "device code" could come *from* the LMU (which is not a vehicle device), the court could not "discern if the jury found infringement of the claims at issue based upon a theory of infringement inconsistent with the proper construction" and therefore had to

"set aside the jury's' verdict of infringement."  *Id.*

Virtually identical errors occurred at the retrial.  As explained above, Omega improperly argued that a "device code" (such as a stored device code) could be provisioned into the flash memory of the Accused LMUs, ignoring the Court's claim construction requiring that a device code be a signal *from* a vehicle device.  As a result, it is impossible to know whether, in finding infringement of the '278 patent, the jury found the "corresponding vehicle device code" to be what Mr. McAlexander improperly identified as the "stored device code" in violation of the Court's construction.  Under the Federal Circuit's reasoning, this significant risk of confusion tainted the jury's consideration of all the "device code" limitations, including in the '278 patent. Just as the Federal Circuit found in the first appeal, because the jury could have been misled by Omega's improper claim construction positions, a new trial is required.  *Omega Patents*, 920 F.3d at 1347-48; *Litton Sys.*, 140 F.3d at 1465 ("[A]n appellate court must also vacate a jury verdict and remand for a new trial if a jury may have relied on an impermissible basis in reaching its verdict." (citing *Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1055 (11th Cir. 1994)).

**B.    Omega Failed to Identify the Required "Corresponding Vehicle Device Code" and "Enabling Data" in the Accused LMUs.**

For the '278 patent, Mr. McAlexander's misstatements regarding the proper construction of "device codes" was the sum total of Omega's showing on that patent's "corresponding vehicle device code" requirement and, necessarily, on its "enabling data" requirement as well.  JMOL of non-infringement is warranted as a result.

On direct examination, Mr. McAlexander did not identify a "corresponding vehicle device code" that the "enabling data" is "related to" in the Accused LMUs.  Day 3 Tr. at 83:19-85:2.  And when Mr. McAlexander was asked specifically about this limitation on cross-examination, he ducked the question, explaining that the bus discovery process "involve[s] some

information that has to correspond to the particular bus and the device." *Id.* at 113:9-114:5. He

claimed to have "outline[d] each one of those codes for the various buses in [the] flow chart" in

his report, but even if that flow chart showed a "corresponding vehicle device code"—and there

is no evidence or expert analysis demonstrating that to be the case—neither the expert report nor

the underlying flow chart was admitted into evidence at trial. *Id.*; Dkt. 312 (showing that PL13

and PL104 were not admitted into evidence).[7] Because Mr. McAlexander's testimony failed to

identify a "corresponding vehicle device code," it is insufficient to establish infringement by the

Accused LMUs. Moreover—despite having been permitted to improperly identify scripts sent

by the LMU as "enabling data" (as discussed below)—Mr. McAlexander's failure to identify a

"corresponding vehicle device code" also necessarily resulted in a failure to demonstrate that the

Accused LMUs satisfy the "enabling data" limitation, which the Court construed to require

"[d]ata related to *the at least one corresponding vehicle device code* for use by said multi-vehicle

compatible controller." Dkt. 50 at 22-23 (emphasis added). Without a "corresponding vehicle

device code," there can be no "enabling data related to" that code, as the claims require. Given

these failures, JMOL that the Accused LMUs do not infringe the '278 patent is warranted.

### C.     Omega's Expert Was Improperly Permitted to Testify Beyond the Scope of His Expert Report With Respect to the "Enabling Data" Limitation.

JMOL of non-infringement of the '278 patent, or at least a new trial, should be granted

for another, independent reason: the jury's verdict may rest on evidence that never should have

---

[7] The expert report would not have supported an infringement finding in any event. The report relied upon supposed "device codes" that originate *from* the LMU (and not from a vehicle device) to allegedly establish infringement of the '278 patent. Appendix E to Mr. McAlexander's report contains his infringement analysis for the '278 patent. Dkt. 145-85 (McAlexander Rpt.) at 40. With respect to the "corresponding vehicle device code" limitation, it explains that "*the multi-vehicle compatible controller [i.e., the LMU] generates* a sequence of device codes to determine compatibility with different vehicles." *Id.* at E-7 (emphasis added). These alleged "device codes" that are "generate[d]" by the LMU do not meet the Court's requirement that a "[d]evice code" is a "[s]ignal from a vehicle device." Dkt. 309 at 11.

been admitted.  CalAmp advised the jury during its opening statement that Mr. McAlexander
would be unable to identify "enabling data . . . that is supposedly related to the device code."
Day 1 Tr. at 169:2-13.  CalAmp's representation was based on the fact that Mr. McAlexander's
expert report failed to identify the alleged "enabling data," the "corresponding vehicle device
code," or any relationship between the two.  Dkt. 145-85 (McAlexander Rpt.) at 42, Appendix E-
9.  The report merely recites that the LMU-3000 "can be configured using a serial port or over
the air using PULS, which can upload firmware or scripts with programming instructions *or
enabling data* to the LMU device."  *Id.* (emphasis added).  This disclosure—which does nothing
more than recite the claim language—says nothing about what constitutes "enabling data" and
thus cannot demonstrate infringement.  Yet the Court permitted Mr. McAlexander to identify the
supposed "enabling data" for the first time at trial, over CalAmp's objection and despite the
Court's *in limine* order prohibiting such testimony.  Day 3 Tr. at 87:17-92:2.

CalAmp was entitled to expect that Mr. McAlexander would be bound to the disclosures
in his expert report.  Rule 26 requires that an expert's report "must contain" "a complete
statement of all opinions the witness will express and the basis and reasons for them," and "the
facts or data considered by the witness in forming them."  Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii).[8]
This Court's Case Management and Scheduling Order explicitly stated that experts would be

---

[8] It is well established that "[a]n expert witness may not testify to subject matter beyond the scope of the witness's
expert report unless the failure to include that information in the report was 'substantially justified or harmless.'"
*Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 725 F.3d 1377, 1381 (Fed. Cir. 2013)
(citation omitted); *id.* ("Failure to comply with Rule 26(a) has significant consequences, including Rule 37's 'self-
executing sanction.'" (citation omitted)).  As the Eleventh Circuit has held, "[i]f a party violates Rule 26(a) or (e),
Rule 37(c) provides for the exclusion of the expert evidence 'unless the failure is substantially justified or is
harmless.'"  *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 718 (11th Cir. 2019) (quoting Fed. Cir. Civ. P. 37(c)).
Omega made no attempt to make such a showing, and in fact moved to preclude *any* expert from going beyond what
was in his expert report.  "Because the expert witness discovery rules are designed to allow both sides in a case to
prepare their cases adequately and to prevent surprise . . . compliance with the requirements of Rule 26 is not merely
aspirational."  *Id.* at 719 (quoting *Reese v. Herbert*, 527 F.3d 1253, 1266 (11th Cir. 2008)).

restricted to *only* the information disclosed in their reports:

> On or before the date set forth in the above table for the disclosure of expert
> reports, the party shall fully comply with Federal Rule of Civil Procedure 26(a)(2)
> and 26(e).  Expert testimony on direct examination at trial will be limited to the
> opinions, bases, reasons, data, and other information disclosed in the written
> expert report disclosed pursuant to this Order.  Failure to disclose such
> information may result in the exclusion of all or part of the testimony of the
> expert witness.

Dkt. 29 at 4; *see also* Dkt. 69 at 3 (same).

If Omega wanted Mr. McAlexander to identify "enabling data" corresponding to a

"vehicle device code" within the Accused LMUs, Omega should "at a minimum … have filed a

motion to extend discovery to permit a proper disclosure, but [Omega] failed to do so."

*Guevara*, 920 F.3d at 719.  Quite the contrary, Omega *resisted* all attempts to re-open discovery

on remand.  Dkt. 272 at 2 ("The Court's pretrial orders control the case for both parties and

provides a path to a just, speedy, and reasonably inexpensive retrial.  CalAmp offers no valid

reason to vacate the pretrial Orders.").  The Court agreed with Omega, and held that the parties

would not be permitted to revisit issues addressed by the previous Case Management and

Scheduling Order, which included the required timing for disclosure of expert opinions, the

bases for them, and supporting information.  Dkt. 277 at 37:1-3 ("So, we have a schedule of

events that take place.  Those are clear.  They're established.  They're designed to ensure the

orderly conduct of a trial."); *see also id.* at 38:10-13 (Court will not change what was "previously

set forth pursuant to the Case Management and Scheduling Order."); *id.* 39:22-40:1 (Court sees

"no reason to deviate" from the procedure it had established).

Notably, prior to the first trial, the Court established a very high standard for expert

disclosures when assessing Omega's *Daubert* challenge to CalAmp's expert, Mr. Andrews.  The

Court held that Rule 26 "requires more than a mere recitation of exhibits which may—in some

undefined manner and through numerous unspecified combinations—demonstrate obviousness."

Dkt. 117 at 16. And in assessing Mr. Andrews' invalidity opinions, the Court stated:

> The omission of critical analysis from the Invalidity Report constitutes bad faith
> or, at a minimum, reflects an approach to litigation which runs contrary to the
> high standards of behavior established in the Federal Rules of Civil Procedure and
> which are expected to be followed by expert witnesses testifying in federal court.
> The Court finds the violation of Rule 26, as it pertains to the ten prior art
> references identified in Mr. Andrews' report, to have resulted in substantial
> prejudice to Omega such that the only proper remedy at this late date is the
> exclusion of Exhibits 24 through 33 along with the testimony relating to how the
> prior art references relate to Mr. Andrews' opinions. Accordingly, Omega's
> motion to exclude opinions not clearly stated in the Rule 26 report is granted.

*Id.* at 16-17. CalAmp justifiably believed that Omega would be held to the same standard it had

proposed and the Court had adopted with respect to CalAmp's expert, and that the Court would

not allow Omega to engage in conduct which "constitutes bad faith or… runs contrary to the

high standards of behavior" expected of parties and experts, such as omitting "critical analysis"

from its expert reports and then trying to introduce that omitted analysis at trial.

Indeed, the Court could not have been clearer. Before the first trial, Omega sought a

ruling that "no expert should be allowed to testify at this trial beyond the opinions included in

their expert report," and that "[t]o the extent that CalAmp seeks to submit evidence or expert

opinions outside of that disclosed during discovery, it should be excluded." Dkt. 94 at 6. In

ruling on Omega's motion, the Court ordered that "*no* expert may testify to matters not properly

addressed in the expert's Rule 26 report," and held that experts are "required to submit a detailed

report, pursuant to Rule 26(a)(2)(B)(i-vi), including 'a complete statement of all opinions the

witness will express and the basis and reasons for them.'" Dkt. 122 at 14-15 (emphasis added).

At the final pretrial conference before the first trial, the Court reiterated that this

governing principle would apply to Mr. McAlexander, just like any other expert witness: "Well,

Mr. McAlexander is going to be limited to the four corners of what he testified to either in

deposition or in his expert opinion; and if his expert opinion is as limited as you suggest, then

your cross-examination is going to be pretty swift, I would think." Dkt. 190 at 42:3-10. Further,

Omega's own motion *in limine* made clear that the requirement that all expert opinions and the

support for them be fully disclosed in an expert report was "fundamental and certainly well

known by counsel for all parties" and that permitting experts to testify beyond their reports

would result in prejudice. Dkt. 94 at 6-7 ("Given the advanced stage of the litigation, permitting

[any] new evidence would not have been harmless, with no discovery, documents or opportunity

to investigate or test [new] theor[ies].").

   Based on these pretrial rulings, the fact that establishing infringement of the '278 patent

was Omega's burden, and the "omission of critical analysis" from Mr. McAlexander's report due

to its failure to identify any "enabling data," CalAmp chose not to bring its own expert to

establish non-infringement. And consistent with the Court's guidance and expectation,

CalAmp's cross-examination of Mr. McAlexander was "pretty swift," no more than 15 minutes.

   Given the utter lack of any other evidence regarding "enabling data," the jury's

infringement verdict for the '278 patent can only be explained by Omega's improper

introduction of analysis and information that appeared nowhere in Mr. McAlexander's report. In

particular, Omega asked Mr. McAlexander to identify the "enabling data" allegedly utilized by

the Accused LMUs. Over CalAmp's objection, he explained—for the first time—that the

"enabling data" is related to the downloading of scripts to the LMU via the PULS system. Day 3

Tr. at 87:17-88:7, 91:3-92:2. In overruling CalAmp's objection, the Court stated—*in open court,

in front of the jury*—that counsel for CalAmp could have asked Mr. McAlexander what the

enabling data were during his deposition. *Id.* at 87:17-91:1 (CalAmp's counsel pointing out that

13

Mr. McAlexander's report "makes the conclusory assertion that enabling data is downloaded, but
[Mr. McAlexander] doesn't say what that enabling data is" and the Court responding that "He
could have been deposed on that topic" and overruling the objection).  Having thus inverted the
parties' burdens, the Court gave Omega *carte blanche* to ignore the boundaries of Mr.
McAlexander's report, in violation of its prior directive that the rule restricting experts to the
information disclosed in their reports would be strictly enforced as to *both* parties.

Had the rules the Court established been respected, Omega would have had an even
clearer failure of proof on the "enabling data" limitation.  *See supra* II.B.  But the Court changed
the rules mid-trial, undermining CalAmp's credibility before the jury and allowing Omega to
mask its own evidentiary shortcoming.  Omega capitalized on this during closing arguments,
highlighting its expert's new opinions and the fact that CalAmp had not offered expert testimony
on "enabling data."  Day 6 Tr. at 5:19-21, 83:8-11.  But the reason CalAmp offered no expert
testimony was its justifiable reliance on the Court's pretrial rulings—the Court had repeatedly
told the parties that *no* expert could go beyond his report.  Had CalAmp known the rules would
change, it would have presented expert testimony rebutting Omega's new, never-previously-
disclosed infringement theory.  On a proper record—a record without Omega's new theory—no
reasonable jury could have found that the '278 patent was infringed by the Accused LMUs.
Accordingly, JMOL that the Accused LMUs do not infringe the '278 patent should be granted
or, in the alternative, at least a new trial should be ordered on this issue.

III.    **If the '278 Patent Is Infringed by the Accused LMUs, the Damages Should be
        Remitted or, Alternatively, CalAmp Should Be Granted a New Trial on Damages.**

It was Omega's burden to establish that its damages demand reflected a reasonable
royalty for any patent found infringed.  Omega presented no evidence upon which a reasonable
jury could conclude that $5 per unit is a reasonable royalty for infringement of the '278 patent.

The jury's damages award therefore should be remitted or a new trial granted. At a minimum, CalAmp should be awarded a new trial on damages because the Court erroneously precluded CalAmp's damages expert, Dr. McDuff, from testifying in rebuttal.

**A.    The Damages Award Does Not Reflect the '278 Patent's Incremental Value.**

A reasonable royalty must be based on the incremental value the patented invention adds to the end product, as apportioned from the value of any non-infringing features the accused product may have. *See, e.g.*, *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1232 (Fed. Cir. 2014). Omega therefore was required to introduce evidence of the "incremental value that the patented invention adds to the end product." *Id.* at 1226. Omega offered no such evidence.

Omega and its experts—Mr. Tregillis and Mr. McAlexander—did not even attempt to apportion, identify, or quantify the incremental value of the claimed inventions of the '278 patent. And Mr. Flick—the named inventor—offered no testimony on the incremental value of any of the asserted patents and testified that he did not "try and rank any of [his] data[bus] patents as being more valuable or less valuable than another." Day 1 Tr. at 214:11-13.

This was consistent with the approach taken by Omega and its experts. They contended that the jury should award the same royalty for all accused products and all asserted patents, regardless of how many patents were infringed, purportedly because the most favored nation (MFN) clauses in certain of Omega's license agreements required that result. *See* Day 3 Tr. at 140:18-141:3 ("[W]hether it's one patent or all the patents, the way that Omega licenses them is it's five bucks . . . . [T]hat's the rate, that's the market rate for the data bus patents, be it one or two or three or four or 30."); *id.* at 148:15-21 ("I believe you're saying that in terms of the rate, CalAmp should pay the same rate no matter how many claims or how many of the patents it infringes; is that right? A. Right. That's what the agreements call for."); *id.* at 141:4-7 ("So I

think that at that point also Omega would say that Most Favored Nations clause says if you

infringe one, we have to charge you at least $5.00.  We can't charge you less than $5.00."); *id.* at

146:21-147:3; *id.* at 132:14-134:22.

The jury, however, rejected this legally improper and factually unsupported theory.  The

jury awarded $1 per unit for infringement of the '727 patent, even though Omega classified the

'727 patent, like the '278 patent, as a "data bus patent[]" under its licenses.  *See, e.g.*, *id.* at

130:11-19.  By so doing, the jury necessarily found—directly contrary to Omega's theory—that

the proper royalty is *not* the same regardless of how many products are at issue or what patents

may be infringed.  The $1 per unit award for the '727 patent also demonstrates that the jury

rejected Omega's MFN argument.  By Omega's own logic, if the MFN clauses in some of

Omega's agreements would prevent Omega from entering into an agreement with CalAmp for

any data bus patent at a rate less than $5 per unit, Omega could not have agreed to a $1 rate for

the '727 patent, yet the jury found that it would have done just that.  *See, e.g.*, *id.* at 134:13-16

("If there is any – any patent that's in this agreement that is part of any later agreement at a lower

rate, then the lower rate will apply for Numerex going forward.").[9]

---

[9] Even if the jury had not rejected Omega's MFN argument, the MFN clauses do not provide a legally sufficient
basis upon which a reasonable jury could have concluded that damages for any data bus patent must be $5 per unit
or more.  Mr. Tregillis acknowledged that the MFN provision of the Numerex agreement—which is representative
of similar provisions in Omega's other agreements (Day 3 Tr. at 169:9-25)—is only triggered if two licensees have
"comparable sales volumes, payment terms, and distribution channels."  *Id.* at 170:1-6.  Yet Mr. Tregillis's report
and trial testimony contained no analysis of any of these factors, *id.* at 170:7-17, and it is undisputed that the sales
volumes under agreements on which he relied—*e.g.* Numerex, Cimble, and Mid City—were trivial compared to the
volumes at issue here (*see infra* at 22).  Thus, not surprisingly, neither Mr. Tregillis nor any other Omega expert
opined that the MFN clauses in those agreements would be triggered by a license with CalAmp.  *See, e.g.*, Day 3 Tr.
at 171:24-172:2.  Moreover, Omega's MFN theory improperly attempts to circumvent the requirement that a
reasonable royalty reflect only the incremental value of the infringed claims.  *See Uniloc USA, Inc. v. Microsoft
Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) ("To be admissible, expert testimony opining on a reasonable royalty
must carefully tie proof of damages to the claimed invention's footprint in the market place.") (internal quotation
marks and citation omitted); *Ericsson*, 773 F.3d at 1233 ("[T]he patent holder should only be compensated for the
approximate incremental benefit derived from his invention.").  Omega's contracts with third parties do not allow it

Moreover, a proper showing of the incremental value of the '278 patent requires that the value of any industry standard reflected or incorporated in that patent be excluded. *See, e.g.*, *Ericsson*, 773 F.3d at 1232-33 (holding "the patented feature must be apportioned from all of the unpatented features reflected in the standard" and reflect "the value of the patented invention (or at least the approximate value thereof), not the value of the standard as a whole"). Here, the record demonstrates that Omega improperly sought to appropriate the value of industry standards for vehicle bus discovery that pre-date Mr. Flick's inventions. For example, Mr. McAlexander testified that the "queries to the bus" that he (improperly, *see supra* II.C) identified as the supposed "enabling data" in the '278 patent are "part of the bus discovery process" that he acknowledged "itself preexisted" Mr. Flick's patents. Day 3 Tr. at 113:1-114:5.

Likewise, Mr. Tregillis confirmed that, for purposes of his damages analysis, he assumed that "because CalAmp's products use the OBD-II data port they necessarily would infringe Mr. Flick's patents," even though—by Mr. Flick's own admission—the OBD-II data port and bus discovery process pre-date Omega's patents. Day 4 Tr. at 14:11-15:7; Day 2 Tr. at 81:4-16, 86:13-15 (confirming that merely connecting to the data bus does not infringe his patents, and that he had no involvement in the design and implementation of the OBD-II connector or bus discovery process). When asked to identify the value of the '278 patent separate and apart from the industry OBD-II standard, Mr. Tregillis replied that it "relates to codes that are stored and communicated through the data bus," without articulating how that was different from the industry standard for data bus discovery. Day 4 Tr. at 18:24-20:7. Ultimately, he conceded that he did not "know the technical details" of what (if any) improvement the '278 patent provides "over just connecting any module to the industry standard data bus." *Id.* at 21:7-10.

---

to evade the damages analysis required by the Federal Circuit.

In sum, Omega made no attempt to identify the incremental value of the '278 patent as apportioned from (1) the value of the industry standard for data bus discovery and other unpatented features and (2) the other data bus patents in Omega's portfolio, including the other asserted patents. Omega thus failed to provide evidence sufficient to support the jury's award of $5 per unit for infringement of the '278 patent.

**B.    The License Agreements Relied Upon by Omega's Expert to Justify the Damages Award Are Not Comparable.**

There is another fundamental problem with Omega's damages theory: Omega and its expert failed to account for the differences between the licenses upon which Omega relied and a hypothetical license to the '278 patent. *Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys, Inc.*, 809 F.3d 1295, 1303 (Fed. Cir. 2015) (noting that a permissible damages model may "begin[] with rates from comparable licenses and then '*account[] for differences* in the technologies and economic circumstances of the contracting parties'") (emphasis added) (citation omitted); *Uniloc*, 632 F.3d at 1317 ("[T]here must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case."). As the Federal Circuit has held, "allegedly comparable licenses may cover more patents than are at issue in the action, include cross-licensing terms, [and] cover foreign intellectual property rights," but "[t]estimony relying on licenses *must* account for such distinguishing facts when invoking them to value the patented invention." *Ericsson*, 773 F.3d at 1227 (Fed. Cir. 2014) (emphasis added). Where, as here, the record does not establish that the proffered licenses are sufficiently comparable to the hypothetical license, the licenses cannot support the jury's award. *See Uniloc*, 632 F.3d at 1316 ("This court noted that the licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in the suit, and that the patentee's failure to do so weighs strongly against the jury's award relying on

18

such non-comparable licenses.") (internal quotation marks and citation omitted).[10]

After allegedly reviewing all of Omega's licenses, Mr. Tregillis focused on Omega's
agreements with Numerex, Mid City, Cimble, and Directed Electronics (DEI) as the basis for his
damages opinion, with Numerex serving as his "base line." *See* Day 3 Tr. at 129:1-132:10, 153-
11-15, 154:1-17; Day 4 Tr. at 4:22-25.  But neither he nor Omega offered any basis upon which
the jury could account for the admitted significant differences between these license
agreements—or any of Omega's other agreements, for that matter—and the hypothetical license
between Omega and CalAmp for the '278 patent.

As Mr. Tregillis acknowledged, a "big difference[]" between the hypothetical license and
the Omega licenses he relied upon is that Omega's agreements cover portfolios of patents far
beyond the '278 patent, including foreign patents, patents on unrelated technology, and patent
applications.  Day 3 Tr. at 126:11-25.  Despite acknowledging this "big difference[]," Mr.
Tregillis never explained how the jury could account for it when assessing damages.  To take one
example, under the Numerex agreement—the supposed "base line" for Mr. Tregillis's analysis—
Numerex received rights to a portfolio of 59 U.S. patents, 9 foreign patents, and several patent
applications.  *Id.* at 154:18-155:5.  In exchange, Numerex paid Omega a royalty of $5 per unit,
the same royalty the jury awarded for infringement of the '278 patent alone.  *Id.* at 155:6-8.  Mr.
Tregillis and Omega made no attempt to account for this significant difference.  And each of
Omega's other agreements suffers from this same problem.  *See, e.g.*, *id.* at 162:4-11 (Cimble

---

[10] CalAmp sought to raise objections to exhibits pretrial and specifically objected to the admission of the Omega
license agreements on the basis that they were not comparable to the hypothetically negotiated license.  *See* Dkt.
267; Dkt. 288.  The Court, however, did not permit CalAmp to raise these objections.  Dkt. 277 at 36:5-9.
Nevertheless, as the Federal Circuit held previously in this case, even if the Omega agreements are admitted into
evidence, CalAmp has the right to challenge the sufficiency of the evidence to support the damages award.  *Omega
Patents*, 920 F.3d at 1350 n.12 ("Failure to object to admission of the evidence does not act as [a] waiver as to a
challenge to the sufficiency of the evidence for the jury to award damages.").

19

agreement covers 36 U.S. patents, 12 foreign patents, and several patent applications); Day 2 Tr.

at 15:22-24 (DEI agreement includes entire data bus patent portfolio); *id.* at 99:12-25 (Trilogix

agreement includes all the data bus patents); *id.* at 110:11-19 (160031 Canada, Inc. license

includes 10 U.S. patents and 3 foreign patents); PL67 (Mid City license includes 23 U.S. patents,

9 U.S. patent applications, and 15 foreign patents and applications).

       In addition, Omega's license agreements—including the Numerex "base line" license

(PL99)—are the result of litigation settlements or the threat of litigation. *See, e.g.*, Day 3 Tr. at

156:19-157:2 (confirming Numerex was a litigation settlement); Day 1 Tr. at 215:15-16

(confirming Omega sued Fortin prior to the license); Day 2 Tr. at 114:15-21 (same); *id.* at 10:15-

25 (confirming Omega sued DEI prior to the license); *id.* at 98:20-99:11 (confirming Omega

sued Trilogix prior to the license); *id.* at 109:7-110:5 (confirming the 160031 Canada/Autostart

license resulted from actual or threatened litigation).  Mr. Flick confirmed that, even where

Omega did not file a lawsuit against its eventual licensee, he "expect[ed] that the companies that

came to [him seeking a license] were aware that [he] had brought a lawsuit against one or more

of their competitors," and that the topic would frequently "come up during [his] negotiations"

with those licensees.  *Id.* at 115:6-11.  As Mr. Tregillis acknowledged, whether a license was

entered into to avoid litigation costs "can be a consideration" when assessing its comparability.

Day 3 Tr. at 155:17-21; *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078-79 (Fed.

Cir. 1983) ("[L]icense fees negotiated in the face of a threat of high litigation costs may be

strongly influenced by a desire to avoid full litigation.") (citation omitted).  Yet, Mr. Tregillis

made no attempt to account for this "consideration."  Day 3 Tr. at 156:19-157:2 ("In your report,

you did not indicate, one way or the other, whether the agreements that you relied on, such as the

Numerex agreement, [were] entered into, to avoid litigation costs, did you?  A. Correct.  Q. And

the Numerex agreement was a settlement agreement reached after Omega sued them; true?  A. I think that's right.").

Mr. Tregillis also made no attempt to account for the stark contrast between the functionality of CalAmp's Accused LMUs and the products licensed under Omega's agreements. Omega acknowledged that the Accused LMUs only read and monitor data through the data bus, which is a key differentiator from Omega's other licensees, whose products control vehicle functions, such as door locks, the engine starter, and the car alarm.  *See, e.g.*, Day 4 Tr. at 11:2-6; Day 2 Tr. at 79:24-80:2 ("Q. And CalAmp's product does not control – the LMUs that are at issue in this lawsuit do not control the starter[], the door locks, or the car alarm; isn't that true? A. Correct."); Day 3 Tr. at 20:2-14, 30:23-31:22; *see also* Day 4 Tr. at 89:2-23 (Mr. Chen explaining that the LMU-3000 cannot control features like the car alarm, horn, door locks, and remote starters).  Mr. Tregillis acknowledged that such differences between the products at issue in the hypothetical license and Omega's existing licenses can be an important consideration in conducting a comparability analysis (Day 3 Tr. at 157:4-12), yet he made no attempt to account for the effect those differences would have on the royalty rate in this case.

With respect to the Numerex agreement, for example, Mr. Tregillis admitted he had no information regarding how the licensed products compared to the Accused LMUs, and therefore did not account for any of those differences.  Day 3 Tr. at 157:22-158:16.  The same was true of the Cimble, Mid City, and DEI agreements, which Mr. Tregillis testified formed the other primary data points for his opinion.  *Id.* at 161:7-162:3 (confirming he had no information regarding the Cimble licensed products); *id.* at 164:10-165:21 (confirming that, despite knowing that Mid City's products performed remote start functions and CalAmp's did not, he did not factor that distinction into his reasonable royalty analysis); Day 2 Tr. at 115:12-24 (confirming

DEI's data bus products operated car alarms and remote starters). Mr. Tregillis did, however, confirm that he could not identify any licensed product that had functionality similar to CalAmp's Accused LMUs, and in fact he did not know if *any* of Omega's licensees sold products with the limited functionality of CalAmp's Accused LMUs. Day 3 Tr. at 158:24-159:5, 159:19-21. Likewise, Mr. Tregillis confirmed that he did not perform any analysis of whether CalAmp's Accused LMUs performed any of the functions identified in Omega's license agreements as subject to a $5 per unit royalty rate, Day 4 Tr. at 6:2-12, and it is undisputed that they do not.

Many of the agreements on which Mr. Tregillis relied were also based on very low sales volumes. For example, Mr. Tregillis confirmed that Numerex's licensed sales were less than 10% of CalAmp's sales (Day 3 Tr. at 171:19-23), and that the Cimble agreement covers sales of less than 200 units and no current sales at the time of his report, so it's a "reasonable expectation" that Cimble would never pay the per unit rates stated in that agreement. *Id.* at 162:12-163:1. Likewise, Mid City is also a "very low-volume seller" that has never sold more than 5,000 units in a given year. *Id.* at 165:22-166:9, 167:2-7. At such low volumes, Mr. Tregillis acknowledged, the licensees might have agreed to these licenses merely to avoid litigation costs given that they knew they would never pay substantial amounts. *Id.* at 167:9-21.

Based at least on the significant differences identified above—which Omega made no attempt to account for at trial—the license agreements that form the basis of Omega's $5 per unit demand are not reasonably comparable to the license at issue in the hypothetical negotiation. As a result, the jury's $5 per unit damages award for the '278 patent lacks sufficient support, and a new trial on damages is required.

**C.      If Any Award is Appropriate, It Should Be Based on the $1 Per Unit Rate in
Certain of Omega's License Agreements.**

At least five of Omega's licenses contain a $1 per unit rate for the functionality of

reading tachometer data from the data bus.  *See* PL103 at OMEGA_CAL000270; PL69 at

OMEGA_CAL000014; PL92 at OMEGA_CAL000159; PL97 at OMEGA_CAL000226; PL86 at

OMEGA_CAL00028.  As Mr. Flick confirmed, the $1 per unit "data to tach" rate contained, for

example, in the Trilogix agreement, is for the functionality of reading "information coming

through the data bus module that came from the ECU."  Day 2 Tr. at 103:10-104:4.  This

functionality maps closely to CalAmp's Accused LMUs, which—by Omega's own admission—

merely read data.  *See, e.g.*, Day 2 Tr. at 79:20-80:2; Day 3 Tr. at 158:24-159:5.  Mr. Flick

confirmed that he felt the $1 per unit rate was reasonable for that type of functionality, and that

he had given the same $1 per unit rate to several other companies for use of that functionality.

Day 2 Tr. at 107:12-19; *id.* at 108:15-109:6, 110:20-111:4.[11]

"Data to tach" is the only feature identified across all of Omega's license agreements that

describes the technology of "simply reading data in response to a query."  Day 2 Tr. at 113:1-4.

And Mr. Flick confirmed that, in his mind, the "data to tach" "feature" equates to a one patent

license.  Day 1 Tr. at 211:7-8 ("each additional feature that was added that would be a different

patent"); Day 2 Tr. at 103:5-6 ("And each feature was pretty much a different patent.").  As such,

Omega's "data to tach" rate of $1 per unit is the rate most relevant to the hypothetical one-patent

license covering the '278 patent and licensing the Accused LMUs, which are only capable of

reading data from the data bus.  Yet, Mr. Tregillis did not even consider the $1 rate.  Day 4 Tr. at

8:15-9:5 (confirming the $1 per unit rate for reading tachometer data contained in the Trilogix,

---

[11] Mr. Flick confirmed that, even after allegedly "standardiz[ing]" his license agreements to adopt a flat $5 per unit
royalty structure, the $1 per unit rate for "data to tach" survived.  Day 2 Tr. 117:24-118:7.

16003 Canada, Omega R&D, ADS, and Fortin agreements was not addressed in his expert

report). He leapt directly to the $5 rate, without even attempting to determine which rate would

be more appropriate for the hypothetical license at issue here. This was error. The Court should

either award a new trial on damages, or remit the damages award for the '278 patent to match the

$1 per unit assessed for the '727 patent, which, based on the number of infringing units identified

by the jury, amounts to total damages of $917,223.

### D.    CalAmp's Damages Expert Was Erroneously Precluded From Providing Unchallenged Rebuttal Opinions That Were Disclosed In His Expert Report.

A new trial on damages is also warranted in light of the Court's error in precluding

CalAmp's damages expert, Dr. McDuff, from testifying in rebuttal to Mr. Tregillis's comparable

license analysis. In ruling on Omega's *Daubert* to Dr. McDuff, the Court erroneously excluded

Dr. McDuff's opinions in their entirety (Dkt. 117 at 27), even though Omega's motion

challenged only Dr. McDuff's affirmative royalty calculations (Dkt. 56), and raised no challenge

whatsoever to Dr. McDuff's qualifications as an economic expert on patent damages, including

with respect to analyzing license agreements.[12] Dkt. 117 at 18-27; *see also* Dkt. 277 at 30:11-13

("The issue of whether [McDuff] was challenging plaintiff's damages expert was really not

directly addressed in the [*Daubert*] motions or the [*Daubert*] order.").

Before the retrial, CalAmp sought clarification on this issue. As CalAmp explained, it

should be permitted to call an expert whose rebuttal testimony had been timely disclosed to

provide testimony that had not been challenged in Omega's *Daubert* motion. Dkt. 266. The

Court, however, denied CalAmp's motion.[13] But then, at trial, the Court allowed Omega to

---

[12] As the Court noted, "Omega stated at the *Daubert* hearing that it does not contest that Dr. McDuff is qualified to render testimony regarding damages in this case." Dkt. 117 at 18; *see also* Dkt. 277 at 30:6-7 ("I addressed Dr. McDuff's qualifications, found he was qualified.").

[13] In ruling on CalAmp's motion for clarification, the Court found the issue had been waived in connection with the

provide rebuttal testimony that had *never* been disclosed in an expert report.  Day 3 Tr. at 53:10-54:6 ("reports are for his testimony in chief, not rebuttal").  This underscored the fundamental unfairness of barring CalAmp from calling its rebuttal damages expert.

And once again, Omega capitalized on this at trial, thereby heightening the prejudice to CalAmp.  Day 6 Tr. at 24:12-16 ("You'll be asked to arrive in the jury room of what a reasonable [royalty] is.  I would offer that that's the only evidence that you have.  CalAmp didn't offer anybody else to refute that number, didn't offer their own expert.").  This is further reason to order a new trial regarding damages if Omega rejects the proposed remittitur.

## CONCLUSION

For the foregoing reasons, CalAmp requests that it be granted the relief sought herein.


Dated:  December 23, 2019                    Respectfully submitted,

                                             By: *s/ Leif E. Peterson, II*

                                             THOMAS D. REIN, ESQ.
                                             (*Pro Hac Vice*)
                                             CONSTANTINE L. TRELA, JR., ESQ.
                                             (*Pro Hac Vice*)
                                             STEPHANIE P. KOH, ESQ.

---

first trial because "the defense did not raise this issue previously; that is, they didn't seek reconsideration of the Daubert order. They did not argue that there was any error in the Daubert order, nor did they take this issue up on appeal." Dkt. 277 at 31:1-12; Dkt. 231 at 17. Even if that were the case, on remand CalAmp cannot possibly have waived the issue given its timely pretrial motion for clarification. Dkt. 266. This is precisely what the Court said CalAmp should have done before the first trial to avoid waiver. Nor is CalAmp's decision not to appeal the *Daubert* ruling a waiver of the issue on retrial. *Signal Oil & Gas Co. v. Barge W-701*, 654 F.2d 1164, 1169 (5th Cir. 1981) ("Unlike res judicata, law of the case *does not operate* to bar subsequent consideration of matters that could have been, but were not, raised and resolved in the earlier proceeding.") (emphasis added). And nothing in the Federal Circuit's opinion implies that CalAmp would be precluded from raising the issue in advance of the new trial. *Omega Patents*, 920 F.3d at 1354 ("On remand, the parties are urged to achieve clarity by clearly presenting evidence, objections, arguments, and jury instructions as to direct and indirect infringement, compensatory damages, and willful infringement, assuming the parties choose to continue pursuing such issues, so that this court may effectively fulfill its appellate function in any further review arising from the retrial.").

*(Pro Hac Vice)*
BRYAN C. MULDER, ESQ.
*(Pro Hac Vice)*
LEIF E. PETERSON, ESQ.
*(Pro Hac Vice)*
**SIDLEY AUSTIN LLP**
One South Dearborn St.
Chicago, IL 60603
Telephone:     (312) 853-7000
Facsimile:     (312) 853-7036
email: trein@sidley.com


*-and-*
CARRIE ANN WOZNIAK, ESQ.
Florida Bar No. 0012666
DAVID S. WOOD, ESQ.
Florida Bar No. 289515
**AKERMAN LLP**
420 South Orange Avenue, Suite 1200
Orlando, FL 32801-4904
Tel.:    407-423-4000
Fax:    407-843-6610
E-mail: carrieann.wozniak@akerman.com


CHRISTOPHER S. CARVER, ESQ.
Florida Bar No. 993580
**AKERMAN LLP**
One Southeast Third Avenue, 25th Floor
Miami, FL 33131-1714
Tel.: 305-374-5600
Fax: 305-374-5095
E-mail:  christopher.carver@akerman.com

*Attorneys for CalAmp Corp*

## CERTIFICATE UNDER LOCAL RULE 3.01(g)

The undersigned counsel for Defendant CalAmp Corp., pursuant to Local Rule 3.01(g), certify that they have conferred with counsel for Plaintiff Omega Patents, LLC regarding the relief requested in this Motion, and that counsel were unable to reach agreement on the resolution of the Motion.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that I electronically filed a true and correct copy of the foregoing on December 23, 2019 with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on parties as listed (through counsel or those reflected as appearing without counsel) in the below Service List via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*s/ Leif E. Peterson, II*

Leif E. Peterson, II

<u>SERVICE LIST</u>
*Omega Patents, LLC v. CalAmp Corp.*
*Case No. 6:13-cv-1950-PGB-DAB*
*United States District Court, Middle District of Florida*

David S. Wood, Esq.
Florida Bar No.: 289515
Email: david.wood@akerman.com
Carrie Ann Wozniak, Esq.
Florida Bar No.: 0012666
Email: carrieann.wozniak@akerman.com
AKERMAN LLP
420 S. Orange Avenue, St., 1200
Orlando, Florida 32801

Christopher S. Carver, Esq.
AKERMAN LLP
One S.E. Third Avenue – 25th Floor
Miami, FL 33131-1714
Tel.: 305-374-5600
Fax: 305-374-5095
E-mail: christopher.carver@akerman.com

Peter Chiabotti, Esq.
AKERMAN LLP
222 Lakeview Avenue, Suite 400
West Palm Beach, FL: 33401
Tel.: 561-653- 5000
Fax: 561-659-6313
E-mail: peter.chiabotti@akerman.com

*Attorneys for CalAmp Corp.*

Brian R. Gilchrist, Esq.
Ryan Thomas Santurri, Esq.
ALLEN, DYER, DOPPELT,
MILBRATH & GILCHRIST, P.A.
255 S. Orange Ave., Suite 1401
P.O. Box. 3791
Orlando, FL 32802
Tel.: 407-841-2330
Fax: 407-841-2343
E-mail: bgilchrist@addmg.com
E-mail: rsanturri@addmg.com

*Attorneys for Omega Patents, LLC*

28